UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID COHAIN D.D.S., et al.,<br><br>               Plaintiffs,<br><br>- against -<br><br>LAURA KLIMLEY, et al.,<br><br>               Defendants. | **ECF CASE**<br><br>08 Civ. 5047 (PGG)<br><br>**MEMORANDUM OPINION &<br>ORDER** |
| D. KENT SISSEL, et al.,<br><br>               Plaintiffs,<br><br>- against -<br><br>LAURA KLIMLEY, et al.,<br><br>               Defendants. | **ECF CASE**<br><br>09 Civ. 4527 (PGG)<br><br>**MEMORANDUM OPINION &<br>ORDER** |
| WAYNE E. PULLINS, DAVID E. PULLINS and<br>DIANNE H. PULLINS,<br><br>               Plaintiffs,<br><br>- against -<br><br>JOHN PALMERO,<br><br>               Defendant. | **ECF CASE**<br><br>09 Civ. 10584 (PGG)<br><br>**MEMORANDUM OPINION &<br>ORDER** |

PAUL G. GARDEPHE, U.S.D.J.:

        The three above-captioned cases arise from Plaintiffs' purchase of debt

instruments from VWE Group, Inc., a company that filed a bankruptcy petition on June 1, 2004.

        Plaintiff David Cohain and twenty-three additional Plaintiffs filed suit against

Defendants Laura Klimley, Maxine Eimicke, John Palmero, the Hereford Credit and Collection

Agency, Inc. and the Victor W. and Maxine Eimicke Foundation on June 2, 2008, in the United States District Court for the Southern District of New York (the "Cohain Action").[1]  The case was assigned to Judge William C. Conner.

That same day, Plaintiff D. Kent Sissel and twenty additional Plaintiffs filed suit against the same five Defendants in the United States District Court for the Southern District of Iowa (the "Sissel Action").[2]  On March 16, 2009, Judge John A. Jarvey granted Klimley's motion to transfer the action to the Southern District of New York, where it was assigned to Judge Conner.  (Dkt. No. 1-38)

Both the Cohain and Sissel Actions were assigned to this Court following Judge Conner's death in July 2009.

Plaintiffs Wayne E. Pullins, David E. Pullins and Dianne H. Pullins (the "Pullins Plaintiffs") filed suit against Defendant John Palmero on April 3, 2008, in the United States District Court for the Southern District of Ohio (the "Pullins Action").  On April 21, 2009, Judge Thomas M. Rose granted Palmero's motion to transfer this action to the Southern District of New York, where it was assigned to this Court.  (Dkt. No. 1-24)

Defendants Klimley and Palmero move to dismiss the Cohain Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and move for judgment on the pleadings in the Sissel Action pursuant

---

[1]  Defendants Maxine Eimicke, the Hereford Credit and Collection Agency, Inc., and the Victor W. and Maxine Eimicke Foundation have all been served in the Cohain Action but have not appeared.  (Dkt. Nos. 9-11)

[2]  Defendant Maxine Eimicke has appeared in the Sissel Action pro se but has not filed any motions with respect to the Sissel Complaint.  (Dkt. No. 1-16)  The Hereford Credit and Collection Agency, Inc. and the Victor W. and Maxine Eimicke Foundation have been served in the Sissel Action but have not appeared.  (Dkt. Nos. 1-10, 1-11)

to Fed. R. Civ. P. 12(c).  Palmero also moves to dismiss the Pullins Action; his motion to dismiss will be treated as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).[3]

For the reasons set forth below, the motions to dismiss and for judgment on the pleadings filed by Defendants Klimley and Palmero in the Cohain and Sissel Actions will be GRANTED.  Palmero's motion for judgment on the pleadings in the Pullins Action will be GRANTED in part and DENIED in part.

## BACKGROUND

In 1958, Victor Eimicke formed VWE Group, Inc. ("VWE").  VWE sold materials designed to assist employers in "the hiring, firing and motivation of employees." (Cohain Cmplt. ¶ 11; Sissel Cmplt. ¶ 11; Pullins Cmplt. ¶ 10)  VWE later began producing and selling greeting cards, a business which ultimately accounted for the majority of its revenues. (Id.)  In December 2003, VWE sold the greeting card business.  (Id.)  On June 1, 2004, VWE filed a bankruptcy petition pursuant to Chapter 11 of the U.S. Bankruptcy Code.  (Cohain Cmplt. ¶ 12; Sissel Cmplt. ¶ 12; Pullins Cmplt. ¶ 11)

Defendant Laura Klimley, Victor Eimicke's daughter, served as Vice President and as a director of the Company.  (Cohain Cmplt. ¶ 6, 14; Sissel Cmplt. ¶ 6, 14)  Defendant John Palmero served as an officer and director of VWE, as well as its controller.  (Cohain Cmplt. ¶ 8; Sissel Cmplt. ¶ 8; Pullins Cmplt. ¶ 9)

---

[3]  A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) may only be made "before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b).  Here, Palmero has already filed a responsive pleading.  (Dkt. No. 1-12)  "[A] motion to dismiss for failure to state a claim . . . that is styled as arising under Rule 12(b) but is filed after the close of pleadings, should be construed by the district court as a motion for judgment on the pleadings under Rule 12(c)."  Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).  Accordingly, this Court construes Palmero's motion in the Pullins Action as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

Throughout its existence, VWE offered debt instruments "with terms from 90 days to 5 years, interim maturity periods of between 1 and 3 years, and interest rates from 10 to 23%" (the "Notes").  (Cohain Cmplt. ¶ 13; Sissel Cmplt. ¶ 13; Pullins Cmplt. ¶ 12)  When VWE filed its bankruptcy petition, the aggregate outstanding principal of the Notes was more than $26 million.  (Cohain Cmplt. ¶ 13; Sissel Cmplt. ¶ 13; Pullins Cmplt. ¶ 13)

The Complaints allege that VWE posted a large annual net loss in every year between 1993 and 2003, in large part because of the "consistent and continuous issuance" of new Notes.  (Cohain Cmplt. ¶ 16-17; Sissel Cmplt. ¶ 16-17; Pullins Cmplt. ¶ 15-16)

The Complaints further allege that despite the Defendants' knowledge of VWE's poor financial condition, VWE "paid cash dividends" and "clearly excessive salaries" to the Eimicke family.  (Cohain Cmplt. ¶ 18-19; Sissel Cmplt. ¶ 18-19; Pullins Cmplt. ¶ 17-18) Additionally, the Complaints claim that VWE made advances in excess of $1.5 million to its officers and directors (Cohain Cmplt. ¶ 20; Sissel Cmplt. ¶ 20; Pullins Cmplt. ¶ 19), including numerous advances to Klimley, who allegedly played no active role in the Company's affairs between 1999 and 2004.  (Cohain Cmplt. ¶ 20; Sissel Cmplt. ¶ 20)  The Complaints also allege that other members of the Eimicke family received advances and loans from VWE, and made inappropriate use of the Company's corporate credit cards.  (Cohain Cmplt. ¶ 21-22; Sissel Cmplt. ¶ 21-22)

The Cohain and Sissel Complaints go on to allege that the officers and directors met on "at least a yearly basis" to "approve the continuation of the Company's illegal Note Program; approve the Company's aforesaid illegal dividends and excessive salaries; and review detailed financial records of the Company prepared by Palmero . . . that clearly demonstrated the continuing and ever deepening insolvency of the Company, the expansion of the illegal Note

Program and the existence of the aforesaid illegal salaries."  (Cohain Cmplt. ¶ 23; Sissel Cmplt. ¶ 23)  Klimley is also alleged to have participated in annual shareholder meetings, where the shareholders approved "the financial records of the Company which clearly disclosed the gross insolvency of the Company."  (Cohain Cmplt. ¶ 24; Sissel Cmplt. ¶ 24)

In 1982, Klimley formed Hereford Credit and Collection Agency, Inc.  (Cohain Cmplt. ¶ 25; Sissel Cmplt. ¶ 25)  The Company paid Hereford a fee each year; the amount of the fee is alleged to be "roughly" the same as the amount Hereford paid in salaries and dividends to Klimley and her sister Alicia Eimicke.  (Id.)

The Cohain and Sissel Complaints also outline various efforts made by members of the Eimicke family to avoid the payment of state and federal income taxes.  Victor Eimicke is alleged to have taken loans from VWE in lieu of his salary, with no intention of repaying the loans.  (Cohain Cmplt. ¶ 26; Sissel Cmplt. ¶ 26)  Eimicke and his wife Maxine are also alleged to have established a foundation, to which they gifted Notes issued by VWE.  (Cohain Cmplt. ¶ 27; Sissel Cmplt. ¶ 27)

The Complaints also allege that VWE "instituted and maintained a policy of not disseminating" financial information to creditors or investors in Company Notes.  (Cohain Cmplt. ¶ 27; Sissel Cmplt. ¶ 27; Pullins Cmplt. ¶ 20)  Each of the Complaints claims that Plaintiffs purchased Notes in reliance on allegedly false representations by Klimley, Palmero and others involved in the Company about VWE's financial health.  (Cohain Cmplt. ¶¶ 30, 34-40; Sissel Cmplt. ¶¶ 30, 34-40; Pullins Cmplt. ¶¶ 22-38, 42)

VWE filed a bankruptcy petition in June 2004, and the Complaints claim that "there is little or no possibility that the Company will successfully emerge from its Chapter 11 bankruptcy filing or generate any meaningful sum from the sale of its assets for repayment of

Plaintiffs."  (Cohain Cmplt. ¶¶ 12, 41; Sissel Cmplt. ¶¶ 12, 41; Pullins Cmplt. ¶¶ 11, 45)  In

October 2007, Alicia Eimicke – Klimley's sister and VWE's former President – was indicted on

thirty-five counts of theft, securities fraud and racketeering.  (Cohain Cmplt. ¶ 43; Sissel Cmplt.

¶ 43)  She pled guilty to those charges on March 28, 2008, allegedly admitting that the Notes

issued by the Company were part of an "illegal [P]onzi scheme."  (Id.)

      Plaintiffs in the Cohain Action bring claims for violations of Section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 (Count 1) (Cohain Cmplt. ¶¶ 44-50); violations

of Section 20(a) of the Securities Exchange Act of 1934 (Count 2) (Cohain Cmplt. ¶¶ 51-53);

fraud (Count 3) (Cohain Cmplt.  ¶¶ 54-58); recovery of a fraudulent conveyance (Count 4)

(Cohain Cmplt.  ¶¶ 59-61); waste of corporate assets (Count 5) (Cohain Cmplt.  ¶¶ 62-64); self-

dealing and deepening insolvency (Count 6) (Cohain Cmplt.  ¶¶ 65-67); civil conspiracy (Count

7) (Cohain Cmplt.  ¶¶ 68-70); breach of fiduciary duty (Count 8) (Cohain Cmplt.  ¶¶ 71-73); and

racketeering (Count 9) (Cohain Cmplt.  ¶¶ 74-81).

      Plaintiffs in the Sissel Action assert these same nine claims (Counts 1-9) (Sissel

Cmplt. ¶¶ 44-81) and a claim under Iowa's Blue Sky Law.  (Count 10) (Sissel Cmplt. ¶¶ 82-87)

      Plaintiffs in the Pullins Action bring claims for violations of Sections 12(1) and

(2) of the Securities Act of 1933 (Count 1) (Pullins Cmplt. ¶¶ 46-58); violations of Section 10(b)

of the Securities Exchange Act of 1934 and Rule 10b-5 (Count 2) (Pullins Cmplt. ¶¶ 59-64);

violations of Section 15 of the Securities Act of 1933 (Count 3) (Pullins Cmplt. ¶¶ 65-67);

violations of Section 20(a) of the Securities Exchange Act of 1933 (Count 4) (Pullins Cmplt. ¶¶

68-70); fraud (Count 5) (Pullins Cmplt.  ¶¶ 71-75); civil conspiracy (Count 6) (Pullins Cmplt.  ¶¶

76-78); violations of Ohio Revised Code § 1707 (Count 7) (Pullins Cmplt.  ¶¶ 79-86); breach of

fiduciary duty (Count 8) (Pullins Cmplt.  ¶¶ 87-89); and racketeering (Count 9) (Pullins Cmplt.
¶¶ 90-97).

**DISCUSSION**

"To survive a motion to dismiss, a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v.
Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570
(2007)).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in
the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing
Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)),
and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v.
Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

"When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes,
consideration is limited to the factual allegations in plaintiffs' . . . complaint, . . . to documents
attached to the complaint as an exhibit or incorporated in it by reference, to matters of which
judicial notice may be taken, or to documents either in plaintiffs' possession or of which
plaintiffs had knowledge and relied on in bringing suit."  Brass v. Am. Film Techs., Inc., 987
F.2d 142, 150 (2d Cir. 1993).

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is
identical to that of a Rule 12(b)(6) motion for failure to state a claim."  Patel, 259 F.3d at 126.

**I.      THE FEDERAL SECURITIES LAW CLAIMS MUST BE DISMISSED**

      **A.      The Claims for Primary Securities Law Violations are Time-Barred**

            **1.      The Applicable Statutes of Limitations**

Plaintiffs in all three actions assert claims for securities fraud under Section 10(b)
of the Securities Exchange Act of 1934 and Rule 10b-5.

"[A] private federal action for securities fraud must be commenced before the earlier of '2 years after the discovery of the facts constituting the violation' or '5 years after such violation.'" Staehr v. Hartford Fin. Servs. Group, 547 F.3d 406, 411 (2d Cir. 2008) (quoting 28 U.S.C. § 1658(b)).

"The two-year statute of limitations for securities fraud claims under the Exchange Act begins to run only after the plaintiff 'obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" Staehr, 547 F.3d at 411 (quoting LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003) (quoting Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir.1992))).

"When there is no actual knowledge, but 'the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry.'" Staehr, 547 F.3d at 411 (quoting Dodds v. Cigna Sec., 12 F.3d 346, 350 (2d Cir. 1993)).

Plaintiffs in the Pullins Action also assert a claim for violations of Sections 12(a)(1) and (2) of the Securities Act of 1933.  Claims brought under Section 12 of the Securities Act "are subject to the one-year statute of limitations set out under Section 13 of the Securities Act."[4]  In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 285 (S.D.N.Y. 2009) (citing

---

[4]  Plaintiffs in the Pullins Action point out that the relevant statute also contains a provision providing that "[i]n no event shall any such action be brought to enforce a liability created under [Section 12(a)(1)] more than three years after the security was bona fide offered to the public, or under [Section 12(a)(2)] more than three years after the sale."  15 U.S.C. § 77m.  This provision provides an absolute limitation, regardless of when "discovery of the untrue statement or the omission" is made or should have been made.  Plaintiffs argue that the three-year statute of limitations applies, because "there has not, as of this date, been a bona fide offering to the public" of the Notes.  (Pltf. Pullins Br. 26)  This argument ignores the discovery provision of 15 U.S.C. § 77m, however, which precedes the absolute three-year bar.  Because Plaintiffs were on

15 U.S.C. § 77m; <u>Dodds v. Cigna Securities, Inc.</u>, 12 F.3d 346, 349-50, 350 n.2 (2d Cir. 1993)).

"The limitations period begins to run when the plaintiff 'obtains actual knowledge of the facts

giving rise to the action or notice of the facts, which in the exercise of reasonable diligence,

would have led to actual knowledge.'"[5]  <u>In re NovaGold Res. Inc. Sec. Litig.</u>, 629 F. Supp. 2d at

285 (quoting <u>Kahn v. Kohlberg, Kravis, Roberts & Co.</u>, 970 F.2d 1030, 1042 (2d Cir. 1992)).

### 2. Plaintiffs Were On Notice of the Alleged Securities Violations in June 2004

"Whether a plaintiff was placed on inquiry notice is analyzed under an objective

standard.  This objective determination can be resolved as a matter of law – it need not be made

by a trier of fact."  <u>Staehr</u>, 547 F.3d at 427 (internal citations omitted).  Indeed, "courts can

---

inquiry notice of their claims in 2004, <u>see infra</u> pp. 9-12, that provision governs the claims
asserted here.

[5]  Plaintiffs suggest that the statute of limitations set forth in Section 804 of the Sarbanes Oxley
Act of 2002 and codified as 28 U.S.C. § 1658(b) – the same statute of limitations that governs
their claims under Section 10(b) – should apply to their claims for violations of Section 12 of the
Securities Act of 1933, because those claims "include allegations of fraud, deceit, manipulation
or contrivance."  (Pltf. Pullins Br. 25-26 n.6)  In support of this suggestion, Plaintiffs cite a
decision from the Southern District of Texas.  <u>See id.</u> (citing <u>Newby v. Enron Corp.</u>, No. MDL-
1446, Civ. A. H-01-3624 (MH), 2004 WL 405886 (S.D. Tex. Feb. 25, 2004).

Courts in this district have held that the statute of limitations contained in Sarbanes-Oxley is
inapplicable to claims brought under Section 12 of the Securities Act of 1933 – even where fraud
is alleged – because no showing of fraudulent intent is required to prove such a violation.  <u>See,
e.g.</u>, <u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 402, 412-16 (S.D.N.Y. 2005) ("[T]he Court's
review of the plain language of Section 804 in its legislative context, and the statutory history of
the provision all support the Court's interpretation that the longer limitations period prescribed in
Section 804 of Sarbanes-Oxley does not apply to claims brought under Sections 11 and 12(a)(2)
of the Securities Act."); <u>ATO RAM II, Ltd. v. SMC Multimedia Corp.</u>, No. 03 Civ. 5569 (HB),
2004 WL 744792, at *5 (S.D.N.Y. April 7, 2004) ("Sarbanes-Oxley did not extend the statute of
limitations for Securities Act § 12 violations.").

Even if the statute of limitations set forth in Section 804 of the Sarbanes-Oxley Act applied to
Plaintiffs' claims for violations of Section 12 of the Securities Act of 1933, those claims would
still be time-barred, for the same reasons that Plaintiffs' Section 10(b) claims are time-barred.
<u>See infra</u> pp. 9-14.

'readily resolve the issue' of inquiry notice as a matter of law on a motion to dismiss – as has been done in 'a vast number of cases' in this circuit – where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint.'"  Id. at 412 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005)).

"[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry.  Such circumstances are often analogized to 'storm warnings.'"  Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993) (internal citations omitted).  The "storm warnings" doctrine has been used to evaluate inquiry notice in cases involving claims for violations of both Section 10(b) of the Securities Exchange Act of 1934 and Section 12 of the Securities Act of 1933.  See, e.g., In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272 (S.D.N.Y. 2009) (applying the storm warnings doctrine in dismissing Securities Act claims, including those asserted under Section 12, as time-barred); In re Salomon Analyst Winstar Litig., 373 F. Supp. 2d 241 (S.D.N.Y. 2005) (applying the storm warnings doctrine in dismissing claims asserted under Section 10(b) as time-barred).

In In re Salomon Analyst Winstar Litigation, the court applied the storm warnings doctrine in determining when plaintiffs were on inquiry notice of their fraud claim, "the core" of which was that "defendants failed to disclose, irrationally minimized, or outright denied with no reasonable basis in fact, Winstar's precarious financial condition."  373 F. Supp. 2d at 245.  The court concluded that plaintiffs were "plainly [] on inquiry notice of their claims no later than April 18, 2001, when Winstar announced it had filed for bankruptcy protection."  Id.

Other courts in this district have similarly found that a bankruptcy petition puts plaintiffs on inquiry notice of claims arising from investments in companies whose financial woes previously went undisclosed or were misrepresented.[6]  See, e.g., BRS Associates, L.P. v. Dansker, 246 B.R. 755, 770 (S.D.N.Y. 2000) ("'In the securities context, district courts in the Second Circuit have ruled that a plaintiff is placed on inquiry notice by his or her actual or constructive knowledge of facts or circumstances indicating that an investment may have gone awry.'  The Court finds that the Plaintiffs were on inquiry notice of the RICO violations as of November 6, 1990, when they learned that Coronet was in bankruptcy proceedings.") (quoting In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig., 850 F. Supp. 1005, 1118 (S.D.N.Y. 1993)); Phillips v. Kidder, Peabody & Co., 933 F. Supp. 303, 307, 312 (S.D.N.Y. 1996) (finding that "the class was on notice of potential claims" relating to a public offering, after which "the value of the stock subsequently plummeted," when the company filed a bankruptcy petition).

Here, Plaintiffs' Securities Exchange Act and Securities Act claims are founded on Klimley and Palmero's alleged "fail[ure] to disclose" VWE's "precarious financial condition" and "outright deni[al] with no reasonable basis in fact" that VWE was in a "precarious financial

---

[6]  The court in Europadisk Holdings, LLC v. Shelton, 03 Civ. 4505 (NRB), 2004 WL 613109, at *4 (S.D.N.Y. Mar. 26, 2004) stated that "[w]hile bankruptcy may constitute a storm warning in combination with other circumstances, it does not necessarily do so per se."  That case is easily distinguished, however.  There, the court noted that "[o]ur decision is guided in part" by the allegation that the company's bankruptcy filing continued to conceal relevant financial information.  Id.  The court "decline[d] to find" that "plaintiff ought to have suspected defendant of perjury and conducted its own investigation of the Company's financial situation," and concluded that "even if the bankruptcy filing had put plaintiff on inquiry notice, the record does not in any way show that a reasonable inquiry by plaintiff would have uncovered" the concealed information.  Id.  The same cannot be said here, where there is no allegation of misstatements or omissions in VWE's bankruptcy filing.  Indeed, the Complaints cite to the filing as evidence of VWE's decline and incorporate by reference documents VWE filed in connection with the bankruptcy proceeding.  See, e.g., Cohain Cmplt. ¶¶ 12, 39, 41; Sissel Cmplt. ¶¶ 12, 39, 41; Pullins Cmplt. ¶¶ 11, 43, 45.

condition."  See In re Salomon Analyst Winstar Litig. 373 F. Supp.2d at 245.  The Complaints

further allege that Plaintiffs, in purchasing the Notes, relied on these false statements.  See, e.g.,

Cohain Cmplt. ¶¶ 46-47; Sissel Cmplt. ¶¶ 46-47; Pullins Cmplt. ¶¶ 53-55, 61-62.  Assuming such

reliance, the falsity of assurances concerning VWE's financial health would have become

apparent when VWE filed its bankruptcy petition.  Accordingly, Plaintiffs were on inquiry notice

of their claims when VWE filed its bankruptcy petition on June 1, 2004.[7]  See In re Salomon

Analyst Winstar Litig. 373 F. Supp. 2d at 245; BRS Associates, L.P., 246 B.R. at 770; Phillips,

933 F. Supp. at 312.

### 3.  Plaintiffs Commenced the Instant Actions After the Statutes of Limitations Expired

Because Plaintiffs were on inquiry notice of their securities law claims as of June

1, 2004, Section 10(b) claims would have to be asserted by June 1, 2006, in order to be timely.

See Staehr, 547 F.3d at 411 (the statute of limitations for actions under Section 10(b) is "the

earlier of '2 years after the discovery of the facts constituting the violation' or '5 years after such

violation.'") (quoting 28 U.S.C. § 1658(b)).  Section 12 claims would have to be asserted by

June 1, 2005, in order to be timely.  See In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp.2d at

285 (setting forth the one-year statute of limitations applicable to Section 12 claims) (citing 15

U.S.C. § 77m).

The Cohain and Sissel Actions were filed on June 2, 2008, two years after the

statute of limitations on their Section 10(b) claims expired and three years after the statute of

---

[7]  While Plaintiffs in the Cohain and Sissel actions assert that they could not have reasonably
discovered the alleged fraud until the closure of VWE in July 2006 (Cohain Cmplt. ¶ 49; Sissel
Cmplt. ¶ 49), they do not provide any factual support for this conclusory statement, nor do they
allege that VWE or the Defendants concealed information in the period following the
Company's bankruptcy filing.  Under Iqbal, this kind of "'naked assertion devoid of 'further
factual enhancement'" is inadequate to defeat a motion to dismiss. See Iqbal, 129 S. Ct. at 1949
(quoting Twombly, 550 U.S. at 557).

limitations on their Section 12 claims expired.  Accordingly, Plaintiffs' securities law claims in Cohain and Sissel are barred by the statute of limitations.

The Pullins Action was filed on April 3, 2008, long after the expiration of the statutes of limitations for the Pullins Plaintiffs' Section 10(b) and Section 12 claims.  The Pullins Plaintiffs argue, however, that the relevant date for assessing the timeliness of their claims is not April 3, 2008, but January 26, 2005 – the date they and others filed Pullins v. Eimicke, et al., No. 05 Civ. 0082 (TMR) (S.D. Ohio).  (Pltf. Pullins Br. 27)

In Pullins v. Eimicke, the Pullins Plaintiffs and others brought claims against Palmero and a number of other defendants.  Pullins v. Eimicke, et al., No. 05 Civ. 0082 (TMR) (Dkt. No. 1).  The suit was filed in the Court of Common Pleas in Clark County, Ohio, but removed to the Southern District of Ohio.  (Id.)  Meanwhile, in VWE's Chapter 11 proceeding, In re the VWE Group, Inc., No. 04-20308 (ASH), VWE moved to extend the automatic stay of actions against it imposed pursuant to 11 U.S.C. § 362 to also stay litigation against Palmero.  In re the VWE Group, Inc., (Dkt. No. 104).  On March 10, 2005, the bankruptcy court issued an order staying Pullins v. Eimicke as against Palmero.  In re the VWE Group, Inc., (Dkt. No. 112). That order was vacated on June 4, 2007.  In re the VWE Group, Inc., (Dkt. No. 244).  Rather than resume litigation of Pullins v. Eimicke as against Palmero at that time, the Pullins Plaintiffs waited ten months and then filed a new lawsuit in the Southern District of Ohio, which was then transferred to the Southern District of New York.

Plaintiffs in Pullins v. Eimicke, including the Pullins Plaintiffs, would have been within their rights to continue that action against Palmero after the lifting of the stay.  However, the Pullins Plaintiffs were not free to wait nearly ten months before commencing an entirely new suit against Palmero – a suit commenced long after the applicable statutes of limitations had

expired.  The Pullins Plaintiffs do not explain why they filed a new suit against Palmero, nor do they cite any authority suggesting that the filing date of the stayed action, <u>Pullins v. Eimicke</u>, should govern the application of the statute of limitations to the instant Pullins Action.

Because the Pullins Action was commenced on April 3, 2008, long after the statutes of limitations governing the Pullins Plaintiffs' federal securities law claims had expired, those claims are time-barred.

> **B.      The Claims for Control Person Liability Must Be Dismissed In Light of <u>the Dismissal of the Claims for Primary Violations of the Securities Laws</u>**

All of the Plaintiffs in the instant actions bring claims for violations of Section 20(a) of the Securities Exchange Act of 1933.  The Pullins Plaintiffs also bring claims for violations of Section 15 of the Securities Act of 1933.  These claims "invoke 'control person' liability," <u>see</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 177 (2d Cir. 2004), and are "necessarily predicated on a primary violation of securities law."  <u>Id.</u>  Where, as here, the "primary securities claims" must be dismissed, "these secondary claims must also be dismissed."  <u>See</u> <u>id.</u>

## II.     PLAINTIFFS' RICO CLAIMS ARE PREEMPTED BY THE <u>PRIVATE SECURITIES LITIGATION REFORM ACT</u>

Section 107 of the Private Securities Litigation Reform Act (the "PSLRA") "bars private causes of action under RICO for predicate acts that describe conduct that would otherwise be actionable as securities fraud."  <u>Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP</u>, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009).  The PSLRA amended the RICO statute to state that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c).

The complaints in all three actions assert claims under the RICO statute, 18 U.S.C. § 1962. Plaintiffs concede that "to the extent [they] are seeking recovery for direct securities fraud the PSLRA bars such action" (Pltf. Cohain/Sissel Br. 35; Pltf. Pullins Br. 31), but Plaintiffs argue that they have also alleged conduct constituting aiding and abetting securities fraud. In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), the Supreme Court held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." Id. at 191. Because aiding and abetting securities fraud is not actionable under the federal securities laws, Plaintiffs argue, it is not preempted by the PSLRA and is actionable under RICO. (Pltf. Cohain/Sissel Br. 35; Pltf. Pullins Br. 31)

"[T]he great weight of precedent" is contrary to Plaintiffs' argument, see Thomas H. Lee Equity Fund V, 612 F. Supp. 2d at 281, as most courts to address the subject have held that "any conduct that would have been actionable as fraud in the purchase or sale of securities" – including aiding and abetting securities fraud – may not be relied upon to establish a RICO violation. See, e.g., Thomas H. Lee Equity Fund V, 612 F. Supp. 2d at 281-83; Fezzani v. Bear, Stearns & Co., Inc., No. 99 Civ. 0793, 2005 WL 500377, at *3-6 (S.D.N.Y. Mar. 2, 2005); Pritikin v. Comerica Bank, No. 09 Civ. 03303 (JF), 2009 WL 3857455, at *3-4 (N.D. Cal. Nov. 17, 2009); Baron v. Chehab, No. 05 Civ. 3240 (JES), 2006 WL 156828, at *7-9 (C.D. Ill. Jan. 20, 2006); see also Howard v. America Online, Inc., 208 F.3d 741, 749-750 (9th Cir. 2000) (holding that plaintiffs who lacked standing to bring securities fraud claims could not assert RICO claims based on the securities fraud conduct, because the PSLRA amendment to the RICO statute bars reliance on "any conduct" actionable as securities fraud); In re Enron Corp. Sec. Derivative & ERISA Litig., 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the

plaintiff, himself, cannot bring a cause of action under the securities laws.  The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws; its wording . . . does not make such a connection.").

Plaintiffs cite OSRecovery, Inc. v. One Groupe International, Inc., 354 F. Supp. 2d 357 (S.D.N.Y. 2005), where the court found that the PSLRA does not bar RICO claims premised on conduct that constitutes aiding and abetting securities fraud, because such conduct is "not actionable under the securities laws and therefore [is] actionable under RICO, assuming the claims are otherwise sufficient."  Id. at 369-70.  OSRecovery has not been relied on for this proposition, however, and several courts have explicitly rejected its reasoning.  See Thomas H. Lee Equity Fund V, 612 F. Supp. 2d at 281 (finding the approach adopted in OSRecovery "unpersuasive"); Baron, 2006 WL 156828, at *9 (noting that the court "is not persuaded by the decision in OSRecovery").  This Court concludes that RICO claims based on aiding and abetting securities fraud are preempted by the PSLRA.

The plain language of 18 U.S.C. § 1964(c) supports this conclusion.  As the Fezzani court explained:

> The RICO amendment states that "no person may rely upon any conduct [actionable as securities fraud] to establish a violation of section 1962". . . . The statute does not say "no person may rely on a defendant's conduct actionable as securities fraud to establish a RICO violation against that defendant."  Rather, it is written broadly to bar reliance on any conduct, no matter whose conduct it is.

2005 WL 500377, at *4 (emphasis in Fezzani).

The legislative history of the PSLRA also supports this reading of the statute. The Conference Committee Report "makes clear that the RICO Amendment was intended by Congress to 'eliminate securities fraud as a predicate offense in a civil RICO action.'"  Thomas

H. Lee Equity Fund V, 612 F. Supp. 2d at 281 (quoting Bald Eagle Area School Dist. v.
Keystone Financial, Inc., 189 F. 3d 321, 327 (3d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-
369, at 47 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 746)).  Congress's intent was to "to
eliminate 'the so-called 'treble-damages blunderbuss of RICO' in securities fraud cases.'"
Fezzani, 2005 WL 500377, at *4 (quoting Mathews v. Kidder, Peabody & Co., 161 F.3d 156,
164 (3d Cir. 1998) (quoting 141 Cong. Rec. H2271 (daily ed. Mar. 7, 1995) (statement of Rep.
Cox))).

        To permit plaintiffs to seek RICO damages on the basis of conduct that
constitutes aiding and abetting securities fraud would be "treacherous," because it would provide
plaintiffs with an

>           "incentive to present only those facts that, if taken as true (as they
>           must be on a motion to dismiss), would not form the basis of a
>           securities fraud claim.  The plaintiff as master of the complaint, see
>           Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc., 535
>           U.S. 826, 831, 122 S. Ct. 1889, 153 L. Ed. 2d 13 (2002), could
>           reap the benefits of a RICO claim complete with the threat of
>           treble damages by merely failing to state a cause of action for
>           securities fraud against a particular defendant while relying on
>           others' securities fraud to establish a RICO claim.  Armed with the
>           knowledge that aiding and abetting a manipulative or deceptive
>           practice is insufficient under Central Bank, for example, a plaintiff
>           could deliberately plead facts that established no more than that a
>           particular defendant aided and abetted another's securities fraud."

Thomas H. Lee Equity Fund V, 612 F. Supp. 2d at 282 (quoting Fezzani, 2005 WL 500377, at
*4).

        Moreover, a reading of the law that would permit RICO claims to be premised on
conduct constituting aiding and abetting securities fraud

>           overlooks that the amendment barring RICO claims was made in
>           the same statute that explicitly dealt with the Supreme Court's
>           decision in Central Bank by authorizing only the SEC – not private
>           parties – to bring enforcement actions against aiders and abettors.

> See PSLRA, Pub. L. No. 104-67, § 104, 109 Stat. 737, 757, codified in 15 U.S.C. § 78t(f).  It would be strange indeed if Congress, in a statute that otherwise bars private causes of action under RICO for predicate acts that describe conduct actionable as securities fraud, nevertheless chose to allow enhanced RICO remedies – treble damages and attorneys' fees – against only the very parties that Congress simultaneously made immune from private suit under the securities laws.

Thomas H. Lee Equity Fund V, 612 F. Supp. 2d at 282-83.

For these reasons, "[t]he better interpretation – and the one supported by the plain meaning" of the statute – is that the PSLRA bars all RICO claims based on any conduct that could be actionable under the securities laws, including conduct that constitutes aiding and abetting securities fraud.  See id.  Here, Plaintiffs concede that their RICO claims are based on such conduct.  (Pltf. Cohain/Sissel Br. 35; Pltf. Pullins Br. 31; see also Cohain Cmplt. ¶ 73; Sissel Cmplt. ¶ 73; Pullins Cmplt. ¶ 91 (alleging that Plaintiffs' RICO claims are premised on "illegal actions in violation of the aforesaid securities laws")).  Accordingly, Plaintiffs' RICO claims are barred by the PSLRA and will be dismissed.

## III.   CLAIMS FOR FRAUDULENT CONVEYANCE, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, SELF-DEALING AND DEEPENING INSOLVENCY ARE THE PROPERTY OF THE TRUSTEE IN THE VWE BANKRUPTCY PROCEEDING

"Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, inter alia, on the rights of the debtor and on certain rights of the debtor's creditors.  Whether the rights belong to the debtor or the individual creditors is a question of state law."  St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688, 700 (2d Cir. 1989); see also Kalb, Voorhis & Co. v. American Financial Corp., 8 F.3d 130, 132 (2d Cir. 1993).

Irrespective of the choice of law analysis applicable to Plaintiffs' other state law claims, see infra pp. 23-35, New York law governs Plaintiffs' claims for fraudulent conveyance,

waste of corporate assets, self dealing and deepening insolvency, and breach of fiduciary duty under the "internal affairs doctrine."

As the Supreme Court has explained, the "internal affairs doctrine" is "'a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers,  directors, and shareholders – because otherwise a corporation could be faced with conflicting demands.'"  Atherton v. FDIC, 519 U.S. 213, 223-24 (1997) (quoting Edgar v. MITE Corp., 457 U.S. 624, 645 (1982)).  Thus, courts "normally look to the [s]tate of a business' incorporation for the law that provides the relevant corporate governance general standard of care."  Atherton, 519 U.S. at 224 (citing Restatement (Second) Conflict of Laws § 309 (1971)).

Here, the parties do not dispute that under the internal affairs doctrine, New York law governs Plaintiffs' claims for fraudulent conveyance, waste of corporate assets, self dealing and deepening insolvency, and breach of fiduciary duty.  See Pltf. Cohain/Sissel Br. 35-36 (discussing how Second Circuit decision applying New York law (Cumberland Oil Corp. v. Thropp, 791 F.2d 1037 (2d Cir. 1986)) supports Plaintiffs' claims); Pltf. Pullins Br. 29-32 (same).

The Second Circuit has held that where a plaintiff's claim against a debtor or "others who have misused the debtors' property in some fashion . . . is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."  St. Paul Fire and Marine Ins. Co., 884 F.2d at 701; see also Kalb, Voorhis & Co., 8 F.3d at 132.  In these cases, individual creditors do not "have standing to

raise that cause of action outside of the bankruptcy proceeding."  St. Paul Fire and Marine Ins.

Co., 884 F.2d at 702 (emphasis in original).  "Making the pursuit of certain causes of action the

sole responsibility of the trustee in bankruptcy furthers the fundamental bankruptcy policy of

equitable distribution among creditors."  Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1041

(2d Cir. 1986).

The Cohain and Sissel Plaintiffs bring claims for fraudulent conveyance, waste of

corporate assets, self dealing and deepening insolvency, and all Plaintiffs assert claims for breach

of fiduciary duty.  These claims assert rights belonging to VWE – the debtor – and could be

brought by any creditor of the Company; as such, they are the property of the debtor's estate in

bankruptcy.  See, e.g., Cumberland Oil Corp., 791 F.2d at 1041 (noting that suits under New

York's fraudulent conveyance statute "assert[] rights belonging to the corporation"); In re

County Seat Stores, Inc., 280 B.R. 319, 326 (Bankr. S.D.N.Y. 2002) (explaining that claims

involving "acts of breach of fiduciary duty, corporate waste and mismanagement . . . become

property of the estate immediately upon the commencement of a bankruptcy case pursuant to

§ 541 of the Bankruptcy Code.  As claims of the bankruptcy estate, only the trustee can bring

them."); BRS Assoc., L.P., 246 B.R. at 771-72 (finding that plaintiffs "have no standing to assert

breach of fiduciary duty" claim because the claim belongs to the debtor corporation); Mediators,

Inc. v. Manney, No. 93 Civ. 2304 (CSH), 1996 WL 554576, at *4 (S.D.N.Y. Sept. 30, 1996)

(finding that a breach of fiduciary duty claim is the property of the creditors' committee or the

trustee in bankruptcy); In re Granite Partners, L.P., 194 B.R. 318, 326 (Bankr. S.D.N.Y. 1996)

(where "acts of mismanagement, waste and breach of fiduciary duty that resulted in the

dissipation of [the company's] assets [are alleged] . . . such claims ordinarily belong to and can

only be enforced by the corporation or through a shareholder derivative action"); In re Keene

Corp., 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994) ("Claims against officers and directors for

breach of fiduciary duty . . . are property of the estate within the meaning of Section 541 of the

Bankruptcy Code.  The trustee, therefore, is the only person with standing to bring those

claims. . . .").

   Citing Cumberland Oil, Plaintiffs argue that because they have alleged

"particularized injury" that they suffered, their claims are not the property of the bankruptcy

trustee.  (Pltf. Cohain/Sissel Br. 35-36; Pltf. Pullins Br. 31-32)  In Cumberland Oil, the court held

that plaintiff's fraud claim belonged to plaintiff and was "not part of the bankruptcy estate."

Cumberland Oil, 791 F.2d at 1042.  The court explained that plaintiff had "alleged with

particularity that misrepresentations of fact were made . . . in furtherance of a conspiracy to

defraud [the plaintiff]."  Id. at 1043.

   While Cumberland Oil makes clear that Plaintiffs' fraud claims are their property,

it does not suggest that Plaintiffs have standing to assert claims alleging general injury to

creditors, such as fraudulent conveyance, waste of corporate assets, self dealing and deepening

insolvency, and breach of fiduciary duty.  Indeed, Cumberland Oil states that the policy of

"[m]aking the pursuit of certain causes of action the sole responsibility of the trustee in

bankruptcy" "would . . . be relevant to this case . . . if [plaintiff] had asserted rights belonging to

the corporation by suing under the New York fraudulent conveyance statute."  Id. at 1042.  This

is precisely what Plaintiffs in the Cohain and Sissel Actions have done.

   Plaintiffs' fraudulent conveyance, waste of corporate assets, self dealing and

deepening insolvency, and breach of fiduciary duty claims allege generalized injury and could be

brought by any of VWE's creditors.  For example, the Cohain and Sissel Plaintiffs' claims for

waste of corporate assets pleads harm to "the Company and its creditors, including Plaintiffs,"

but pleads no injury specific to Plaintiffs.  See Cohain Cmplt. ¶¶ 62-64; Sissel Cmplt. ¶¶ 62-64.

Similarly, Plaintiffs' claims for breach of fiduciary duty list duties – such as "the duty to direct

the affairs of the Company in an honest and prudent manner" – owed to all creditors.  See

Cohain Cmplt. ¶ 72; Sissel Cmplt. ¶ 72; Pullins Cmplt. ¶ 88.  The mere fact that Plaintiffs claim

that these breaches were "intentional" and part of a broader fraudulent scheme does not suffice to

make a generalized injury particular to them.  See BRS Assoc., L.P., 246 B.R. at 771-72 (finding

that plaintiffs "have no standing to assert breach of fiduciary duty" based on misrepresentations,

omissions and fraudulent conduct where plaintiffs had "preserve[d] their direct claim" through

common law fraud claim).

> Finally, Plaintiffs' right to assert these claims has already been vindicated in the
context of VWE's bankruptcy proceeding.  On May 31, 2006, as part of the proceedings in
bankruptcy court, the Creditors' Committee brought an adversary proceeding against Klimley
and Palmero.[8]  Creditors' Committee v. Klimley, No. 04 Br. 20308 (ASH), No. 06-ap-8296,
Complaint (Dkt. No. 1).  In that action, the Creditors' Committee asserted claims for, inter alia,
recovery of fraudulent conveyances, recovery of illegal payments and waste of corporate assets,
breach of fiduciary duty, and self-dealing and deepening insolvency.  Id. at 15-19.  On February
28, 2007, the bankruptcy court entered an order approving a settlement agreement that brought
the adversary proceeding to an end.  In re VWE Group, Inc., No. 04 Br. 20308 (ASH), February
27, 2007 Order (Dkt. No. 227).

---

[8]  "[C]ourts routinely take judicial notice of documents filed in other courts, [] not for the truth of
the matters asserted in the other litigation, but rather to establish the fact of such litigation and
related filings."  Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).  This Court
may take judicial notice of VWE's bankruptcy proceeding and consider the existence of those
proceedings on a motion to dismiss.  See Brass, 987 F.2d at 150.

Plaintiffs' claims for fraudulent conveyance, waste of corporate assets, self dealing, deepening insolvency and breach of fiduciary duty are the property of the bankruptcy estate – and, indeed, have been pursued by the Creditors' Committee in the context of VWE's bankruptcy proceeding.  As a result, Plaintiffs do not have standing to assert these claims, and they will be dismissed.  See St. Paul Fire and Marine Ins. Co., 884 F.2d at 701-02.

## IV.   CHOICE OF LAW

### A.   The Cohain Plaintiffs' State Law Claims Are Governed By New York Law

"""[I]mplied consent . . . is sufficient to establish choice of law.""  Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) (quoting Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989))).  Here, the Cohain Plaintiffs assert claims under New York law, see Cohain Cmplt. ¶ 1, and have not disputed that New York law governs their state law claims.  See Klimley Br. 12 n. 5; Klimley Reply Br. 3 n. 3. Accordingly, this Court will apply New York law to their claims.

### B.   The Sissel Plaintiffs' State Law Claims Are Governed By New York Law

#### 1.   This Court Must Follow New York's Choice of Law Rules

After a case has been transferred pursuant to 28 U.S.C. § 1404(a), "'the transferee court must follow the choice-of-law rules that prevailed in the transferor court.'"  Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 333 (2d Cir. 2005) (quoting Ferens v. John Deere Co., 494 U.S. 516, 519 (1990).  "There is, however, a well-established exception to [this] rule. When the action could not have been maintained in the transferor court, the applicable law, including choice of law rules, is the state law of the transferee court."  Mopex, Inc. v. AMEX, LLC, No. 02 Civ. 1656 (SAS), 2002 WL 342522, at *4 (S.D.N.Y. Mar. 5, 2002) (citing Von

Grabe v. Ziff Davis Publ'g Co., No. 91 Civ. 6275 (DLC), 1995 WL 688912, at *4 (S.D.N.Y.

Nov. 20, 1995); Lombard v. Econ. Dev. Admin. of Puerto Rico, No. 94 Civ. 1050 (LAP), 1995

WL 447651, at *2 (S.D.N.Y. July 27, 1995); Aequitron Med., Inc. v. CBS, Inc., No. 93 Civ. 950

(SS), 1994 WL 30414, at *3 (S.D.N.Y. Feb. 2, 1994)).  The "most common" application of this

exception is "where the transferor court lacked personal jurisdiction over the defendant."

Mopex, 2002 WL 342522, at *5.

The Sissel Action was originally filed in the Southern District of Iowa and was

transferred to this Court pursuant to 28 U.S.C. § 1404(a).  (Dkt. No. 1-38)  Palmero and Klimley

claim that the Iowa court did not have personal jurisdiction over them, and that the action could

not have been maintained in Iowa.  (Klimley Cohain/Sissel Br. 2-6; Palmero Cohain/Sissel Br. 6)

As a result, they argue, New York's choice of law rules should apply to the Sissel Plaintiffs'

state law claims.  (Id.)

"The plaintiff[s] bear[] the burden of establishing that the [Iowa] court ha[d]

jurisdiction over the defendant[s]," Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d

Cir. 2001), and plaintiffs "may carry this burden 'by pleading in good faith . . . legally sufficient

allegations of jurisdiction, i.e., by making a 'prima facie showing' of jurisdiction.'" Id. (quoting

Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998) (quoting Ball v. Metallurgie

Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990))).

"'A federal court in a diversity action may assume jurisdiction over nonresident

defendants only to the extent permitted by the long-arm statute of the forum state and by the Due

Process Clause.'"  Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1073 (8th Cir. 2004)

(quoting Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991)).  Iowa's long-arm

statute "expands Iowa's jurisdictional reach to the widest due process parameters allowed by the

United States Constitution." Hammond v. Fla. Asset Fin. Corp., 695 N.W.2d 1, 5 (Iowa 2005).

"'Due process[, however,] requires "minimum contacts" between [a] non-resident defendant and the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice."'" Dever, 380 F.3d at 1073 (quoting Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1102 (8th Cir. 1996) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980))).

The Eighth Circuit has developed "a five-part test for measuring minimum contacts:  (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.  The first three factors are of primary importance." Bell Paper Box v. U.S. Kids, 22 F.3d 816, 819 (8th Cir. 1994) (citing Austad Co. v. Pennie & Edmonds, 823 F.2d 223, 225 (8th Cir. 1987); Land-O-Nod Co. v. Bassett Furniture Indus., Inc., 708 F.2d 1338, 1340 (8th Cir. 1983)).

The Sissel Plaintiffs all reside in Iowa.  The Sissel Complaint further pleads that "the Company, including Defendants Klimley, Palmero and Maxine Eimicke, actively encouraged Plaintiffs to invest in the Company both in person and by telephone in New York and New Jersey by making false and misleading statements in regards to the financial status of the Company."  (Cmplt. ¶ 30)  The Complaint also pleads that "Notes were at all relevant times offered for sale in New York, New Jersey and other States by the Company and its officers and directors, including Defendants Klimley, Palmero and Maxine Eimicke through personal, mail and telephone solicitations."  (Cmplt. ¶ 13)  The Complaint further explains that "a substantial portion of the subject misrepresentations and solicitations were made to Plaintiffs in the Southern District of Iowa by means of the telephone and mails and disseminated by Plaintiffs in the

Southern District of Iowa and Plaintiffs took delivery of the subject securities in the Southern

District of Iowa."  (Cmplt. ¶ 3)

These statements do not allege any contacts between Klimley and Palmero and

the state of Iowa.  The Complaint does not allege that Klimley or Palmero contacted Plaintiffs in

Iowa by telephone or by mail, nor does it allege that Klimeley and Palmero met with Plaintiffs in

Iowa.  Although the Complaint indicates that "misrepresentations and solicitations" were made

to Plaintiffs in Iowa, it does not specify that those "misrepresentations and solicitations" were

made by Klimley or Palmero.

Having failed to allege any personal contacts between Klimley and Palmero and

Iowa, Plaintiffs must rely on Defendants' responsibility for VWE's communications and contacts

concerning the sale of Notes in Iowa.  Under Iowa's "corporate shield" doctrine, "a person's

mere association with a corporation that causes injury in the forum state is not sufficient in itself

to permit the forum to exercise jurisdiction over the agent."  State ex rel. Miller v. Moneda

Corp., 571 N.W.2d 1, 3 (Iowa 1997).  "A corporate shield," however, "does not insulate an agent

under all circumstances; the agent is still subject to personal jurisdiction of the court if the agent

is a 'primary participant[] in an alleged wrongdoing intentionally directed at [forum-state]

resident[s], and jurisdiction over [him] is proper on that basis.'"  Id. at 4 (quoting Calder v.

Jones, 465 U.S. 783, 790 (1984)).

Plaintiffs contend that "Iowa enjoys personal jurisdiction over [] Klimley and

Palmero on the basis of their primary participation in wrongdoings directed at Iowa residents."

(Pltf. Cohain/Sissel Br. 27)  The allegations in the Complaint, however, are not sufficient to

demonstrate that Klimley and Palmero were "primary participants" in the alleged wrongdoing in

Iowa.

DeCook v. Environmental Sec. Corp., 258 N.W.2d 721 (Iowa 1977), relied on by Plaintiffs, demonstrates why their Complaint is insufficient.  In that case, the Iowa Supreme Court considered whether the exercise of personal jurisdiction was appropriate where three non-resident directors of an Iowa corporation participated in a meeting in Illinois during which they voted to authorize the sale of stock in Iowa in accordance with Iowa's blue sky laws.  Id. at 723, 726-28.  The directors subsequently converted assets of the Iowa corporation by arranging for the transfer of $100,000 in the corporation's assets to the account of another entity that they controlled.  Id. at 723.  The court held that the corporate shield doctrine did not apply to the defendants because the allegations went beyond their "mere directorship in an Iowa based corporation" and included allegations that the defendants "caused tortious injury to corporate shareholders in this state by (1) authorizing the sale of securities in Iowa, then (2) aiding in converting resultant revenues to their own benefit or other self-serving uses."  Id. at 728.  The court also noted that "[w]ithout doubt these defendants could have reasonably foreseen their asserted tortious activities would have a significant impact in the state of Iowa.  In a broad sense it is asserted they conspired to deplete assets of the Iowa corporations."  Id.

Unlike in DeCook – where it was clear both that the defendants had specifically targeted Iowa by voting to sell stock there and that the defendants knew that their actions would injure an Iowa corporation – the Sissel Complaint does not plead that Klimley or Palmero engaged in any conduct targeting Iowa residents.  Accordingly, the Complaint does not plead facts sufficient to demonstrate that Klimley and Palmero can be held responsible for VWE's actions in Iowa as "primary wrongdoers."  See DeCook, 258 N.W.2d at 726-28; see also Moneda Corp., 571 N.W.2d at 6-7 (finding that individual defendants were "primary wrongdoers" where they were "responsible for the design, layout and writing" of promotional materials they opted to

market in Iowa and where the individual defendants "mailed solicitations to consumers across

Iowa"); State ex rel. Miller v. Baxter Chrysler Plymouth, Inc., 456 N.W.2d 371, 378 (Iowa 1990)

(finding that defendant officers of corporate automobile dealerships were protected by the

corporate shield doctrine from the exercise of personal jurisdiction in a suit claiming that their

dealerships disseminated deceptive and unlawful advertising in Iowa).

Because the Iowa court lacked personal jurisdiction over Klimley and Palmero,

this action could not have been maintained in Iowa.  Accordingly, New York's choice of law

rules apply to the Sissel Action.[9]  See Mopex, 2002 WL 342522, at *4-5.

### 2.        New York Law Applies to the Sissel Plaintiffs' State Law Claims

In determining governing substantive law, New York's choice of law rules require

courts to engage in an "'interests analysis,' applying the 'law of the jurisdiction with the most

significant interest in, or relationship to, the dispute.'"  Thomas H. Lee Equity Fund V, L.P., 612

F. Supp. 2d at 283 (quoting White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281,

284 (2d Cir. 2006) (citation and internal quotation marks omitted)).

The "interests analysis" requires "'two separate inquiries . . . to determine the

greater interest:  (1) what are the significant contacts and in which jurisdiction are they located;

and, (2) whether the purpose of the law is to regulate conduct or allocate loss.'"  Krock v.

Lipsay, 97 F.3d 640, 645-46 (2d Cir. 1996) (quoting Padula v. Lilarn Properties Corp., 84

N.Y.2d 519, 620 (1994)).

"In all interest analyses, 'the significant contacts are, almost exclusively, the

parties' domiciles and the locus of the tort.'  The respective importance of each of those contacts

is determined by the nature of the law in question. Where the parties are domiciled in different

---

[9]  The Sissel Plaintiffs' claim for violations of Iowa's Blue Sky Law (Sissel Cmplt. ¶¶ 82-87)
cannot be maintained under New York law and, accordingly, will be dismissed.

states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws. . . ."  Krock, 97 F.3d at 646 (quoting AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992)).  Where "the case at hand concerns laws regulating allegedly fraudulent conduct, the proper body of law to be applied turns on the locus of the tort."  Krock, 97 F.3d at 646.

Here, eighteen of the Sissel Plaintiffs are domiciled in Iowa, while the two remaining Sissel Plaintiffs are domiciled in Arizona and Michigan.  (Sissel Cmplt. Caption) Each of the Defendants – including Klimley and Palmero – are domiciled in New York.  (Id.) Because this case involves "conduct-regulating laws," determination of "the locus of the [alleged] tort[s]" is crucial.  The allegations in the Sissel Complaint involve the conduct of officers and directors of a New York corporation engaged in allegedly fraudulent activity in New York, including the design, approval, implementation and execution of the fraudulent Note program and the making of improper payments to Eimicke family members.  See, e.g., Sissel Cmplt. ¶¶ 19-20, 23.  Clearly, the locus of the torts alleged in the Sissel Complaint is New York. As a result, New York substantive law governs the claims asserted in the Sissel Action.  See Krock, 97 F.3d at 646; see also Thomas H. Lee Equity Fund V, L.P., 612 F. Supp. 2d at 284 (applying New York law where loss was suffered in Massachusetts but "the fraud originated and [] substantial activities in furtherance of the fraud" occurred in New York).

### C.  The Pullins Plaintiffs' State Law Claims Are Governed By Ohio Law

#### 1.  Ohio's Choice of Law Rules Must be Applied

As discussed above, after a case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court must follow the choice of law rules of the transferor jurisdiction, unless the action could not have been maintained in the transferor court.  See Fin. One Pub. Co. v. Lehman

Bros. Special Fin., Inc., 414 F.3d 325, 333 (2d Cir. 2005); Mopex, Inc. v. AMEX, LLC, No. 02

Civ. 1656 (SAS), 2002 WL 342522, at *4 (S.D.N.Y. Mar. 5, 2002).  In that event, the transferee

court applies the choice of law rules of the jurisdiction in which it sits.  Mopex, 2002 WL

342522, at *4.

   The Pullins Action was originally filed in the Southern District of Ohio and was

transferred to this Court pursuant to 28 U.S.C. § 1404(a).  (Dkt. No. 1-24)  Palmero claims that

the Ohio court did not have personal jurisdiction over him, and that the action could not have

been maintained in Ohio.  (Palmero Pullins Br. 6-9)  As a result, he argues, the state law of the

transferee court – New York law – applies to the Pullins Plaintiffs' state law claims.  (Id.)  The

Pullins Plaintiffs contend, however, that Palmero waived his right to contest personal jurisdiction

in Ohio.  (Pullins Br. 21-22)

   The parties do not dispute that Palmero preserved this argument for purposes of

Federal Rule of Civil Procedure 12(h)(1) by asserting the Ohio court's lack of personal

jurisdiction as an affirmative defense in his Answer.  See Dkt. No. 1-12.  Asserting a defense of

lack of jurisdiction in an answer, however, "'do[es] not preserve the defense in perpetuity.'"

Saratoga Harness Racing Inc. v. Veneglia, No. 94 Civ. 1400, 1997 WL 135946, at *7 (N.D.N.Y.

Mar. 18, 1997) (quoting Burton v. Northern Dutchess Hospital, 106 F.R.D. 477, 481 (S.D.N.Y.

1985).  The Second Circuit has held that "a 'delay in challenging personal jurisdiction by motion

to dismiss' may result in waiver, 'even where . . . the defense was asserted in a timely answer.'"

Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 60 (2d Cir. 1999) (quoting Datskow v. Teledyne,

Inc., 899 F.2d 1298, 1303 (2d Cir. 1990)).  In such cases, defendants are held to have forfeited

the right to contest personal jurisdiction.  See Hamilton, 197 F.3d at 61 (noting that "the issue is

more properly considered one of forfeiture than of waiver," because "where a litigant's action or

inaction is deemed to incur the consequence of loss of a right, or, as here, a defense, the term

'forfeiture' is more appropriate").

        In determining whether forfeiture has occurred, courts "consider all of the

relevant circumstances," including the "length of time . . . between the assertion of the defense in

the answer and the litigation of the defense in a motion." Id. at 61.  "Although the passage of

time alone is generally not sufficient to indicate forfeiture of a procedural right, the time period

provides the context in which to assess the significance of the defendant's conduct, both the

litigation activity that occurred and the opportunities to litigate the jurisdictional issue that were

forgone." Id.

        Here, 18 months passed between Palmero's assertion of lack of personal

jurisdiction in his Answer – filed on July 10, 2008 – and Palmero's motion for judgment on the

pleadings, served on April 13, 2010.[10]  (Dkt. Nos. 1-12, 5)  After filing his Answer, Palmero

appeared before Judge Thomas M. Rose for an initial pre-trial conference on November 13,

2008.  (Dkt. No. 1-15)  That same day, Judge Rose issued an order requiring the parties to make

initial disclosures by November 28, 2008, and file any motions to dismiss or for judgment on the

pleadings by January 30, 2009.  (Id.)  Palmero did not file a motion to dismiss, nor did he move

for judgment on the pleadings by that date.  Instead, on January 19, 2009, Palmero moved to

transfer the Pullins Action to this Court, pursuant to 28 U.S.C. § 1404(a), which provides for

---

[10]  Twenty-one months passed between service of the Complaint on April 26, 2008 (Dkt. No. 1-5) and Palmero's motion.  After the Complaint was served, the parties entered into two stipulations extending Palmero's time to answer.  (Dkt. No. 1-7, 8)  The Ohio court struck those stipulations, however, because the first stipulation was filed after Palmero's time to answer had already expired.  (Dkt. No. 1-9)  As a result, Palmero was forced to move for leave to file an answer.  (Dkt. No. 1-10)  The Ohio court granted Palmero permission to file an answer on July 13, 2008.  See Dkt. No. 1-12.  Accordingly, Palmero's Answer was filed two and a half months after he was served with the Complaint.  He then waited an additional 18 months before filing the instant motion.

transfers based on "the convenience of parties and witnesses" and "in the interest of justice." (Dkt. No. 1-17)  In so moving, Palmero did not argue that the Ohio court lacked personal jurisdiction over him;[11] instead, he contended that judicial economy and the balance of conveniences favored a transfer to this district.  Id.

The eighteen months that passed between the filing of Palmero's Answer and the instant motion is a "considerable length of time."  See Hamilton, 197 F.3d at 61.  While many of the cases in which a defendant was found to have forfeited a personal jurisdiction defense involve a longer period of time, see Infinity Consulting Group, LLC v. American Cybersystems, Inc., No. 09 Civ. 1744 (JS), 2010 WL 2267470, at *2 (E.D.N.Y. May 30, 2010) ("Typically, courts have found forfeiture only if the party waited years before moving. . . ."), the Second Circuit has made clear that "the time period provides the context in which to assess the significance of the defendant's conduct, both the litigation activity that occurred and the opportunities to litigate the jurisdictional issue that were forgone."  Hamilton, 197 F.3d at 61; see also Saratoga Harness Racing Inc., 1997 WL 135946, at *7-8 (finding that defendants had forfeited a personal jurisdiction defense where "over one full year" had passed between the filing of the answer and the assertion of the defense and "defendants had participated in status conferences and engaged in discovery").

Here, Palmero appeared for a pre-trial conference at which a discovery and motion schedule was set.  (Dkt. No. 1-15)  Palmero failed to move to dismiss or for judgment on the pleadings by the deadline set by the Ohio court, however.  See id.  That Palmero filed a

---

[11]  Palmero's assertion to the contrary (Palmero Pullins Br. 3) is disingenuous.  While Palmero argued in his motion to transfer that he had "no substantial contacts with Ohio," he did so in the context of explaining why "the overall convenience of the parties" favored a transfer to New York, where Palmero resides.  (Dkt. No. 1-17 at 10-11)  The term "personal jurisdiction" does not appear in Palmero's brief in support of his motion to transfer.  See Dkt. No 1-17.

motion to transfer did not relieve him of his obligation to comply with the Ohio court's motion schedule. Indeed, had the Ohio court denied Palmero's motion to transfer, he would not have been permitted to then move for judgment on the pleadings under the terms of Judge Rose's scheduling order. See id. Moreover, Palmero's motion to transfer did not assert that the Ohio court lacked personal jurisdiction. See Hamilton, 197 F.3d at 61 (noting that the defendant had forfeited a personal jurisdiction defense where, "when the prospect of an MDL transfer arose, [the defendant] could have objected on jurisdictional grounds to including this case, or at least sought to defer its inclusion in the transfer until the jurisdictional issue was resolved. Instead, [the defendant] joined with other defendants in asking the MDL to effect the transfer.").

Palmero had several opportunities to move to dismiss the Pullins Action based on the Ohio court's lack of personal jurisdiction: before filing his Answer; in the four months between the filing of his Answer and the initial pre-trial conference; before the January 2009 deadline set for such motions; and in connection with his motion to transfer this case. Palmero chose not to pursue his jurisdictional objection at each juncture, and chose to ignore the Ohio court's deadline for filing a motion challenging personal jurisdiction.

Under these circumstances, although Palmero asserted personal jurisdiction as a defense in his Answer, he forfeited the right to assert that defense as a result of his inaction and violation of the Ohio court's scheduling order. See Hamilton, 197 F.3d at 61. Because this action could have been maintained in the Southern District of Ohio, the Pullins Plaintiffs' state law claims are governed by Ohio's choice of law rules. See Fin. One Pub. Co., 414 F.3d at 333; Mopex, 2002 WL 342522, at *4-5.

### 2.     Under Ohio's Choice of Law Rules, Ohio Law
###         Applies to the Pullins Plaintiffs' State Law Claims

"In tort actions, Ohio traditionally relied upon <u>lex</u> <u>loci</u> <u>delicti</u>, the place where the

tort occurs, in determining the law to be applied." <u>Muncie Power Prods. v. United Techs. Auto.,</u>

<u>Inc.</u>, 328 F.3d 870, 874 (6th Cir. 2003).  However, in <u>Morgan v. Biro Mfg.</u>, 15 Ohio St.3d 339,

342, 474 N.E.2d 286 (1984), the Ohio Supreme Court held that "a party may overcome the

presumption that the law of the place where the injury occurs will be applied to a tort action, if it

can demonstrate that another state has a more significant relationship to the action." <u>Muncie</u>

<u>Power Prods.</u>, 328 F.3d at 874.  In assessing which state has the more significant relationship to a

tort action, courts consider:  "'(a) the place where the injury occurred, (b) the place where the

conduct causing the injury occurred, (c) the domicil, residence, nationality, place of

incorporation and place of business of the parties, and (d) the place where the relationship, if

any, between the parties is centered.'"  <u>Id</u>. (quoting Restatement (Second) of Conflict of Laws

§ 145 (1971)).

In the context of a fraud action, courts applying Ohio law must also consider:

"'(a) the place, or places, where the plaintiff acted in reliance upon the defendant's

representations, (b) the place where the plaintiff received the representations, (c) the place where

the defendant made the representations, [and] (d) the domicile, residence, nationality, place of

incorporation and place of business of the parties.'"  <u>Sky Tech. Partners, LLC v. Midwest</u>

<u>Research Inst.</u>, 125 F. Supp. 2d 286, 296-97 (S.D. Ohio 2000) (quoting Restatement (Second) of

Conflict of Laws § 148(2)).

Here, under Ohio's choice of law rules, Palmero has not demonstrated that New

York has a more significant relationship to this action than Ohio.  (Indeed, Palmero has not cited

any case applying Ohio law on this issue.)  While Palmero is domiciled in New York (Pullins

Cmplt. Caption) and his alleged misrepresentations and much of the allegedly fraudulent conduct took place in New York (Pullins Cmplt. ¶¶ 17-19, 22-37), several of the other relevant factors favor the imposition of Ohio law.  In particular, all three of the Pullins Plaintiffs are domiciled in Ohio, and the Pullins Plaintiffs allegedly received Palmero's representations in Ohio (see, e.g., Pullins Cmplt. ¶ 22) and acted in reliance upon those representations in Ohio in purchasing Notes.  Because consideration of the relevant factors under Ohio's choice of law rules does not lead to the conclusion that New York has a more significant relationship to this action than Ohio, Ohio law governs the remainder of the Pullins Plaintiffs' state law claims.

## V.    THE COHAIN AND SISSEL PLAINTIFFS' FRAUD CLAIMS MUST BE DISMISSED

"To state a claim for fraudulent misrepresentation under New York law, 'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result  of such reliance.'"  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 186-87 (2d Cir. 2004) (quoting Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)).

### A.    The Fraud Claims are Inadequately Pled

Federal Rule of Civil Procedure 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud. . . . Malice, intent, knowledge, and other conditions of a person's mind[, however,] may be alleged generally."  Fed. R. Civ. P. 9(b).  This rule requires that plaintiffs alleging fraud "'(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are

fraudulent.'"  Eternity Global Master Fund Ltd., 375 F.3d at 186-87 (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

   The Cohain and Sissel Plaintiffs allege a series of misrepresentations and omissions in general terms.  Their Complaints note that "[t]he Company, at the direction of [Klimley, Palmero and Maxine Eimicke], consistently explained to the Plaintiffs and other investors that this practice [of not providing financial information] was not uncommon among 'family businesses' and [was] not something to be concerned about given the 'long and profitable' nature of the Company."  (Cohain Cmplt. ¶ 29; Sissel Cmplt. ¶ 29)

   The Cohain and Sissel Complaints also plead that "the Company actively withheld financial information from the Plaintiffs," and "at the direction of officers and directors of the Company, including Defendants Klimley, Palmero and Maxine Eimicke, actively encouraged Plaintiffs to invest in the Company . . . by making false and misleading statements in regards to the financial status of the Company."  (Cohain Cmplt. ¶ 30; Sissel Cmplt. ¶ 30)

   The Complaints further allege that Klimley and Palmero, among others, "took steps to actively conceal the true financial status of the Company" and "actively assist[ed]" in the dissemination of false and misleading statements. (Cohain Cmplt. ¶¶ 35, 56; Sissel Cmplt. ¶ 35, 56)

   These allegations are not sufficient to satisfy the requirements of Rule 9(b). Although the Cohain and Sissel Complaints each consume nearly fifty pages (exclusive of exhibits), they fail to "identify the speaker" of the alleged false representations, or the person who failed to disclose the required information, and do not "state where and when the statements (or omissions) were made."  See Eternity Global Master Fund Ltd., 375 F.3d at 186-87; Odyssey Re Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000) ("In

cases where the alleged fraud consists of an omission and the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege:  (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud.”); see also Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291 (2d Cir. 2006) (affirming the district court’s dismissal of fraud claims under New York law where plaintiffs did not point to specific misrepresentations on which they relied).

### B.      The Fraud Claims May Not Be Premised On Omissions

Additionally, to the extent the Cohain and Sissel Plaintiffs base their fraud claims on Klimley and Palmero’s alleged omissions, their claims must be dismissed, because they have not demonstrated that Klimley and Palmero had any duty to disclose the information at issue.

While “‘a fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information,’” Lerner, 459 F.3d at 292 (quoting Kaufman v. Cohen, 760 N.Y.S.2d 157, 165 (1st Dep't 2003)), “[i]t is well established that corporations do not have a fiduciary relationship with their unsecured creditors, including debt security holders.  The relationship is contractual rather than fiduciary.”  Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc., No. 06 Civ. 5383 (JGK), 2007 WL 2077153, at *5 (S.D.N.Y. July 20, 2007) (collecting cases).  “‘Under New York law, creditors are owed a fiduciary duty by officers and directors of a corporation only when the corporation is insolvent.’” RSL Commns. PLC v. Bildirici, 649 F. Supp. 2d 184, 202 (S.D.N.Y. 2009) (quoting Cooper v. Parsky, No. 95 Civ. 10543 (JGK) (NRB), 1997 U.S. Dist. LEXIS 3665, 1997 WL 242534, at *22 (S.D.N.Y. Mar. 27, 1997), rev'd on other grounds, 140 F.3d 433 (2d Cir. 1998)).

"[T]he duty that directors owe to the creditors of an insolvent corporation under New York law is defined primarily by the 'trust fund doctrine.'"  RSL Communs. PLC, 649 F. Supp. 2d at 202.  Under this doctrine, "'officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors.'"  Id. (quoting Credit Agricole Indosuez v. Rossiyskiy Kredit Bank, 94 N.Y.2d 541, 549 (2000)).  Therefore, "'directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors.'"  RSL Communs. PLC, 649 F. Supp. 2d at 202 (quoting Hughes v. BCI Int'l Holdings, Inc., 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006)).

Plaintiffs contend that Klimley and Palmero owed fiduciary duties to them as Note holders because the Company was insolvent.  (Pltf. Cohain/Sissel Br. 31-33; Cohain Cmplt. ¶ 55; Sissel Cmplt. ¶ 55)  The duty officers and directors of an insolvent corporation owe to creditors, however, is "to preserve the assets of the corporation," RSL Communs. PLC, 649 F. Supp. 2d at 202, and the cases discussing the "trust fund doctrine" do not refer to a more general duty to disclose information about the financial health of the corporation.  See id.; Credit Agricole Indosuez, 94 N.Y.2d at 549.  The authority relied on by Plaintiffs is not to the contrary.  For example, Plaintiffs cite to Rothmiller v. Stein, 143 N.Y. 581 (1894), which provides that an omission "may not be fraudulent" but "[i]f there be a legal obligation to speak, such as in a case of trust, or confidence, or superior knowledge, or means of knowledge, the case is altogether different."  Id. at 595.  Here, Klimley and Palmero had no such "legal obligation to speak."  Accordingly, even if the Cohain and Sissel Plaintiffs' claims of fraud based on material omissions had been adequately pled, they would be dismissed, because Klimley and Palmero had no obligation to disclose the information at issue.

**VI.      THE COHAIN AND SISSEL PLAINTIFFS HAVE
          <u>FAILED TO STATE CLAIMS FOR CIVIL CONSPIRACY</u>**

"Under New York law, a claim for civil conspiracy requires an independent

actionable tort." <u>Food Holdings, Ltd. v. Bank of Am. Corp.</u>, 477 F. Supp. 2d 602, 613 (S.D.N.Y.

2007); <u>see</u> <u>also</u> <u>Vasile v. Dean Witter Reynolds</u>, 20 F. Supp. 2d 465, 481 (E.D.N.Y. 1998) ("New

York law does not recognize a tort action for civil conspiracy.  However, while New York does

not recognize conspiracy as an independent cause of action in tort, a cause of action for

conspiracy to do something unlawful is valid to the extent that the underlying conduct alleged

states a cause of action.") (internal citations and quotations omitted).

For the reasons set forth above, the Cohain and Sissel Plaintiffs have failed to

state a valid cause of action.  Accordingly, their claims for civil conspiracy must also be

dismissed.  <u>See</u> <u>Food Holdings, Ltd.</u>, 477 F. Supp. 2d at 613 (dismissing a claim for civil

conspiracy where all other claims alleged were barred and thus plaintiffs had alleged "no

underlying torts to support [the civil conspiracy claim]").

**VII.     <u>THE PULLINS PLAINTIFFS HAVE STATED A TIMELY CLAIM FOR FRAUD</u>**

"To prove fraud or fraudulent inducement [under Ohio law], a plaintiff must

establish '(1) a false representation concerning a fact or, in the face of a duty to disclose,

concealment of a fact, material to the transaction; (2) knowledge of the falsity of the

representation or utter disregard for its truthfulness; (3) intent to induce reliance on the

representation; (4) justifiable reliance upon the representation under circumstances manifesting a

right to rely; and (5) injury proximately caused by the reliance.'" <u>Micrel, Inc. v. TRW, Inc.</u>, 486

F.3d 866, 874 (6th Cir. 2007) (quoting <u>Lepera v. Fuson</u>, 613 N.E.2d 1060, 1063 (Ohio Ct. App.

1992)).

Palmero seeks to dismiss the Pullins Plaintiffs' fraud claim on the grounds that it is time-barred and inadequately pled.[12]  Neither argument is persuasive.

## A.   The Fraud Claim Is Timely

Pursuant to Ohio Rev. Code § 2305.09, a four-year statute of limitations governs claims for fraud under Ohio law.  Merrill Lynch, Pierce, Fenner & Smith v. Jaros, 70 F.3d 418, 422 (6th Cir. 1995).  "The time period begins to run when there was a reasonable opportunity to discover the actions complained of."  Id.

As set forth above, supra pp. 9-12, the Pullins Plaintiffs were on notice of the alleged fraud when the Company filed for bankruptcy protection on June 1, 2004.  The Pullins Action was filed on April 3, 2008, less than four years later.  Accordingly, the Pullins Plaintiffs' fraud claim is timely.  See Jaros, 70 F.3d at 422.

## B.   The Fraud Claim Is Pled with Sufficient Particularity

"Both Rule 9(b) of the Federal Rules of Civil Procedure and Rule 9(B) of the Ohio Rules of Civil Procedure require fraud to be pled with particularity. To satisfy this requirement, a 'plaintiff must allege specifically times, places, [and] contents . . . of the underlying fraud.'"  Ullmo v. Gilmour Acad., 273 F.3d 671, 678 (6th Cir. 2001) (quoting Vild v. Visconsi, 956 F.2d 560, 567 (6th Cir. 1992)).

The Pullins Complaint alleges several specific conversations between Palmero and Wayne Pullins in which Palmero allegedly misrepresented the financial health of the Company.  (Pullins Cmplt. ¶¶ 22-37)  For example, the Pullins Complaint alleges that

---

[12]  Palmero also argues that the Pullins Plaintiffs may not allege fraud on the basis of omissions, because Palmero did not have a duty to disclose information concerning VWE's financial health to them.  (Palmero Pullins Br. 15-16)  Palmero relies entirely on New York law, which does not apply here.  See supra pp. 29-35.  Furthermore, the Pullins Complaint's fraud claim is based on "misrepresentations and guarantees," rather than omissions.  (Pullins Cmplt. ¶¶ 71-75)

> [o]n or about January 5, 1995, Wayne Pullins was solicited by [Palmero] by telephone to invest the sum of $20,000 in the Company's Note Program. During the course of this conversation, Mr. Palmero falsely represented that the Company was financially strong and that the offering was, as always, only being offered to family members. At the time of this representation, Mr. Palmero was aware that the Company was insolvent and that the offering was not limited to family members.

(Pullins Cmplt. ¶ 22) This allegation and others in the Complaint aver that Palmero made affirmative, intentional misrepresentations to Wayne Pullins, intending to and ultimately succeeding in inducing Pullins and his family members to purchase the Notes. These allegations are sufficient to state a claim for fraud under Ohio law.

## VIII.   THE PULLINS PLAINTIFFS' CLAIM UNDER OHIO SECURITIES LAW IS TIME-BARRED

"Under Ohio law, the statute of limitations for all claims arising from the sale of securities is the two-year statute of limitations found in O.R.C. § 1707.43(B). . . ." Hardin v. Reliance Trust Co., No. 04 CV 02079 (SO), 2006 WL 2850455, at *5 (N.D. Ohio Sept. 29, 2006). That statute provides:

> No action for the recovery of the purchase price as provided for in this section, and no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707 of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than five years from the date of such sale or contract for sale, whichever is the shorter period.

O.R.C. 1707.43(B). The Sixth Circuit, in applying this provision, has concluded "that the Ohio courts would apply a standard consistent with the 'inquiry notice' standard applicable to similar federal securities fraud claims." Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 562 (6th Cir. 2005). Accordingly, the Pullins Plaintiffs' claim under Ohio securities law must be

dismissed as time-barred for the same reasons this Court cited above, supra pp. 7-14, in

dismissing the Pullins Plaintiffs' federal securities law claims.

## IX.   THE PULLINS PLAINTIFFS HAVE ADEQUATELY ALLEGED A CIVIL CONSPIRACY CLAIM

"Under Ohio law, a civil conspiracy is 'a malicious combination of two or more

persons to injure another in person or property, in a way not competent for one alone, resulting in

actual damages.'" Chesher v. Neyer, 477 F.3d 784, 805 (6th Cir. 2007) (quoting Williams v.

Aetna Fin. Co., 700 N.E.2d 859, 868 (Ohio 1998)).  "'The malice involved in the tort is that state

of mind under which a person does a wrongful act purposely, without a reasonable or lawful

excuse, to the injury of another.'  Moreover, '[a]n underlying unlawful act is required before a

civil conspiracy claim can succeed.'" Chesher, 477 F.3d at 805 (quoting Williams, 700 N.E.2d

at 868).

Palmero, relying exclusively on New York law, contends that the Pullins

Plaintiffs' civil conspiracy claim must be dismissed because civil conspiracy is not an

independent cause of action in New York.  (Palmero Pullins Reply Br. 9)  The Pullins Plaintiffs

have alleged an underlying unlawful act – fraud – and a combination of two or more persons –

Palmero and other named officers and directors of the Company – that caused them injury.  This

is sufficient to state a claim for civil conspiracy under Ohio law.

## CONCLUSION

For the reasons stated above, Klimley and Palmero's motions to dismiss the

Cohain and Sissel Actions are GRANTED.

Palmero's motion to dismiss is DENIED with respect to the Pullins Plaintiffs'

claims for common law fraud and civil conspiracy but otherwise GRANTED.

Plaintiffs may seek leave to amend their Complaints within ten calendar days.

The Clerk of the Court is directed to terminate the following motions:

08 Civ. 5047 – Docket Nos. 33, 35;
09 Civ. 4527 – Docket Nos. 12, 17;
09 Civ. 10584 – Docket No. 5.

Dated: New York, New York
September 20, 2010

SO ORDERED.

Paul G. Gardephe
United States District Judge